In re William O'CALLAGHAN, Debtor.

William O'Callaghan, Plaintiff,

v.

United States of America, Internal Revenue Service, Defendant.

Bankruptcy No. 99–14794–8G7.
Adversary No. 99–589.

United States Bankruptcy Court,
M.D. Florida,
Tampa Division.

Sept. 14, 2004.

Buddy D. Ford, Tampa, FL, for Debtor.

### FINDINGS OF FACT, CONCLUSIONS OF LAW, AND MEMORANDUM OPINION

PAUL M. GLENN, Chief Judge.

**THIS CASE** came before the Court for a final evidentiary hearing in the above-captioned adversary proceeding.

The Debtor, William O'Callaghan, filed a petition under chapter 7 of the Bankruptcy Code on September 10, 1999. The United States of America, Internal Revenue Service (IRS) filed a Proof of Claim in the Debtor's chapter 7 case in the amount of $2,064,558.00 for income tax liabilities for the 1981, 1982, 1983, and 1984 tax years.

The Debtor subsequently commenced this adversary proceeding by filing a Complaint to Determine Dischargeability of Debt against the IRS. Generally, the Debtor contends that the tax liabilities claimed by the IRS are dischargeable in his chapter 7 case because they do not fall within any exception to dischargeability set forth in § 523(a) of the Bankruptcy Code.

In response, the IRS contends that the tax liabilities are nondischargeable under § 523(a)(1)(C) of the Bankruptcy Code, because the Debtor "willfully attempted ... to evade or defeat such tax."

### Background

The Debtor worked as an investment manager on Wall Street in the early 1980's. (Transcript, p. 40). During that time period, the Debtor owned a home in New Jersey and commuted to New York City for work.

The Debtor filed Form 1040 income tax returns for the 1981, 1982, 1983, and 1984 tax years. The returns were prepared by an accounting firm. (Transcript, p. 36).

The IRS subsequently audited the Debtor's returns for the tax years in question, and determined that additional taxes were owed. (Debtor's Exhibit 2, Income Tax Examination Changes). According to the Debtor, the adjustments related to the IRS's disallowance of his cost basis in connection with the sale of certain Pennzoil stock, and the underlying tax liability totaled approximately $80,000.00. (Transcript, pp. 36, 47–48). The taxes were assessed in 1986, 1987, and 1994. (IRS Proof of Claim No. 1).

The Debtor was contacted by various IRS agents after the adjustments were made, and personally met with the agents over the next several years. (Transcript, pp. 38–44). The Debtor believes that the adjustments were made in error, and disputes the assessment of the additional taxes. (Transcript, p. 36).

In 1989 or 1990, the Debtor hired Vincent Barrella (Barrella) to represent him

in his dispute with the IRS. (Transcript, pp. 45–46). Barrella, an attorney in New York City, represented the Debtor for approximately six to seven years, and met with the IRS approximately thirty times over the course of the representation. (Transcript, pp. 48, 50).

During a portion of this time, in 1991, 1992, and 1993, the Debtor was employed by Flair Communications, Inc. (Flair). W–2 Wage and Tax Statements were prepared by Flair for those years, and filed with the IRS. (Debtor's Exhibit 11). The W–2's list the Debtor's address and social security number, and reflect the federal income tax that was withheld and paid for the respective years.

The Debtor sold his home in New Jersey in 1992, and moved to Florida in June of 1994. (Transcript, pp. 32, 49).

On May 25, 1994, the Debtor signed a Residential Loan Application in connection with the proposed purchase of a home located at 738 Mandalay Avenue, Clearwater Beach, Florida. (Debtor's Exhibit 31). On the Loan Application, the Debtor listed an asset consisting of an account at Redstone Securities, Inc. (Redstone) in an amount exceeding $300,000.00. The Debtor testified that the Redstone account held certain stock that he owned in his employer, Flair Communications. (Transcript, p. 138).

On June 7, 1994, the Debtor's proposed lender transmitted a Request for Verification of Deposit to Redstone, and Redstone replied that the current balance in the account was $255,038.00. (Debtor's Exhibit 34).

According to the Debtor, between June 8 and July of 1994, Flair underwent a "reverse merger" with a separate company known as Tier Environmental. As a result of the reverse merger, the Debtor's stock in Flair became virtually worthless. (Transcript, pp. 139–40).

On July 1, 1994, the Debtor signed a Collection Information Statement for the IRS. (Debtor's Exhibit 15). On the Statement, the Debtor disclosed his ownership of 1,300,000 shares of stock identified as "F.L.C.T." at a value of $.0004 per share (or $520.00). According to the Debtor, these shares represent his stock in Flair after the "reverse merger" had occurred. (Transcript, pp. 138–140). The Debtor did not list any real property as an asset as of July 1, 1994.

On July 7, 1994, the Debtor closed the purchase of his home on Mandalay Avenue in Clearwater Beach. (See Debtor's Exhibit 32). The Mandalay Avenue home was titled solely in the Debtor's name.

According to the Debtor, the IRS was aware that he moved to Florida, and two agents visited his home on Clearwater Beach shortly after the move. (Transcript, pp. 50–51).

After the visit from the agents, in late 1994 or early 1995, the Debtor hired a second attorney, Jan Neiman, to represent him in the continuing dispute with the IRS. (Transcript, p. 53). Jan Neiman's legal practice is located in Miami, Florida.

The Debtor submitted an Offer in Compromise to the IRS in May of 1995. (Debtor's Exhibit 20). The Offer was apparently prepared by the Debtor's attorneys, and was accompanied by a narrative statement of facts, legal argument, and conclusion that the Debtor "is not liable for any taxes for 1981, 1982, 1983, and 1984." The amount of the Offer in Compromise was $10.00.

The IRS subsequently rejected the Debtor's Offer. (Debtor's Exhibit 21).

After the rejection of the Offer in Compromise, the Debtor initiated a proceeding before an IRS Appeals Officer in Miami.

Although no documentary evidence was admitted regarding this proceeding, the Debtor testified that the hearing lasted approximately one-half day in 1996 or 1997, and that he was represented by both attorney Barrella and attorney Neiman. According to the Debtor, the proceeding resulted in a reduction of the total liability from approximately $2,000,000.00 to approximately $1,000,000.00. (Transcript, pp. 54–56).

On February 28, 1997, the IRS served a tax levy on the Debtor's bank account at Am South Bank. (Debtor's Exhibit 23).

On October 30, 1997, the Debtor submitted another Offer in Compromise to the IRS. (Debtor's Exhibit 12). The amount of the offer was $113,500.00, and a check in that amount was tendered to the IRS with the Offer. The Debtor testified that he borrowed the funds from his girlfriend's family to make the Offer. (Transcript, p. 64). The Offer was accompanied by a Collection Information Statement signed by the Debtor. The assets listed on the Collection Information Statement include the Debtor's home on Clearwater Beach, a leased Mercedes, and his AmSouth bank account.

The Offer in Compromise was rejected on September 24, 1998. (Debtor's Exhibit 14).

The Debtor filed a petition under chapter 7 of the Bankruptcy Code on September 10, 1999. The IRS subsequently filed its Proof of Claim in the chapter 7 case in the amount of $2,064,448.00, based upon the Debtor's income tax liabilities for 1981, 1982, 1983, and 1984.

### Discussion

The Debtor contends that the tax liabilities set forth in the IRS's Proof of Claim are dischargeable in his chapter 7 case because they do not fall within any exception to dischargeability under § 523(a) of the Bankruptcy Code. In response, the IRS asserts that the tax liabilities are non-dischargeable pursuant to § 523(a)(1)(C), because the Debtor "willfully attempted . . . to evade or defeat such tax."

### I.   Section 523(a)(1)(C)

Section 523(a)(1)(C) of the Bankruptcy Code provides as follows:

**11 USC § 523.   Exceptions to discharge**

(a) A discharge under section 727, 1141, 1228(a), 1228(b), or 1328(b) of this title does not discharge an individual debtor from any debt—

(1) for a tax or a customs duty—

.        .        .        .        .

(C) with respect to which the debtor made a fraudulent return *or willfully attempted in any manner to evade or defeat such tax.*

11 U.S.C. § 523(a)(1)(C)(Emphasis supplied).

■ Two elements are required for a tax debt to be nondischargeable pursuant to the second prong of § 523(a)(1)(C). First, the attempt to evade or defeat the tax must be "willful." Second, the debtor must have engaged in "conduct" evidencing his attempt to evade or defeat the tax. "The plain language of the second prong of § 523(a)(1)(C) contains a conduct requirement (that the debtor 'attempted in any manner to evade or defeat [a] tax'), and a mental state requirement (that the attempt was done 'willfully')." *In re Fretz,* 244 F.3d 1323, 1327 (11th Cir.2001).

■ The first element, "willfulness," is established if the attempt to evade or defeat the tax was made "voluntarily, consciously or knowingly, and intentionally." *In re Fretz,* 244 F.3d at 1330. It is generally held that the government satisfies this element by proving that the debtor "(1)

had a duty to file income tax returns and pay taxes; (2) knew he had such a duty; and (3) voluntarily and intentionally violated that duty." *In re Fretz,* 244 F.3d at 1330. *In re Pert,* 248 B.R. 659, 664 (Bankr.M.D.Fla.2000)(To determine whether a debtor intended to evade a tax, the Court must determine whether the debtor had a duty under the law to pay the tax, whether he knew of the duty, and whether he voluntarily and intentionally violated the duty.) See also *In re Griffith,* 206 F.3d 1389, 1396 (11th Cir.2000). Under this three-part test for "willfulness," the required mental state is established as long as the debtor's violation of his duty was voluntary and intentional, rather than simply due to an inadvertent mistake. It is not necessary, however, to show that the debtor's intent was fraudulent. *In re Hassan,* 301 B.R. 614, 623 (S.D.Fla.2003).

■ With respect to the second element under § 523(a)(1)(C), the "conduct requirement," the Eleventh Circuit Court of Appeals provided the following explanation in *Fretz:*

> To summarize, as the law of this circuit now stands, the conduct requirement of § 523(a)(1)(C) is not satisfied where a debtor has filed accurate returns and simply failed to pay taxes as the debtor in *Haas* did.... The conduct requirement is satisfied, however, where a debtor engages in affirmative acts to avoid payment or collection of taxes as the debtor in *Griffith* did.

*In re Fretz,* 244 F.3d at 1328–29(citing *In re Haas,* 48 F.3d 1153 (11th Cir.1995) and *In re Griffith,* 206 F.3d 1389 (11th Cir. 2000)). The Eleventh Circuit had initially held in *Haas* that a debtor's simple failure to pay a tax, without more, did not cause the tax debt to be nondischargeable under § 523(a)(1)(C). In its holding, the Court distinguished between the debtor's attempt to evade or defeat the *payment or collection* of the tax (which did not result in nondischargeability), and the debtor's attempt to defeat the *assessment* of the tax (which did result in nondischargeability). *In re Haas,* 48 F.3d at 1157–61. In *Griffith,* however, the Eleventh Circuit modified its position, and concluded that § 523(a)(1)(C) could apply to a debtor's efforts to evade the payment or collection of a tax (as distinguished from his efforts to evade the assessment of the tax), provided that the nonpayment was coupled with specific conduct evidencing his attempts to evade or defeat the payment.

> [W]hile we reaffirm the primary holding of *Haas* that mere nonpayment of taxes, without more, does not constitute a willful attempt to evade or defeat taxes under § 523(a)(1)(C), we hold that § 523(a)(1)(C) does render nondischargeable tax debts where the debtor engaged in affirmative acts constituting a willful attempt to evade or defeat payment of taxes.

*In re Griffith,* 206 F.3d at 1395–96(The "more reasonable interpretation of § 523(a)(1)(C) is that it renders nondischargeable tax debts where the debtor engaged in affirmative acts seeking to evade or defeat collection of taxes.")

■ The government bears the burden to prove, by a preponderance of the evidence, that a particular claim is nondischargeable under § 523(a). *In re Griffith,* 206 F.3d at 1396. In a case under § 523(a)(1)(C), the "IRS bears the burden of proof, and the standard is by a preponderance of the evidence." *In re Pert,* 248 B.R. at 664.

## II. Application

### A. Willfulness

As set forth above in the discussion of "willfulness," a tax obligation is nondischargeable under § 523(a)(1)(C) of the

Bankruptcy Code if the debtor voluntarily and intentionally violated his duty to pay the tax.

■ A debtor's "willfulness" is a question of fact to be determined based on all of the circumstances surrounding his failure to pay the tax. *In re Hassan*, 301 B.R. at 618–20. "The issue of whether Debtor willfully attempted to evade payment of taxes is a question of fact for the Bankruptcy Judge to determine from the totality of the record." *United States v. Uria*, 180 B.R. 688, 691 (S.D.Fla.1995).

■ In this case, of course, it is clear that the Debtor was aware of the taxes, and that he had not paid them. Nevertheless, the Court finds that the Debtor's nonpayment of the taxes assessed for the 1981, 1982, 1983, and 1984 tax years was not "willful" within the meaning of the statute. In reaching this conclusion, the Court relies on various factors surrounding the long-term dispute.

First, the underlying liability did not arise from the Debtor's underreporting or misstatement of his income. See *In re Hassan*, 301 B.R. at 620. Instead, the taxes are based on the IRS's disallowance of his cost basis in connection with a sale of stock (an audit decision that the Debtor continues to dispute). Consequently, this case is similar to the situation in *Uria*, in which the Court found that the debtor's tax obligations were dischargeable, even though he had been aware of his responsibility to pay them. In that case, the Court pointed out that the debtor had regularly filed his returns and disclosed his income, but that the tax claim at issue resulted from a one-time, unexpected liability because of the disallowance of certain tax shelters. *United States v. Uria*, 180 B.R. at 691.

Second, and perhaps more significantly, the record indicates that the Debtor communicated with the IRS and worked steadily "within the system" since the time that the taxes were assessed. Specifically, the Debtor testified that he met with IRS agents as early as the late–1980's, including various meetings at the IRS's offices in New York City as well as at the Debtor's home. (Transcript, pp. 38–44).

The record also reflects that the Debtor hired an attorney in New York and an attorney in Florida who specialized in tax matters, and that the attorneys also worked within the IRS's system to challenge the tax claim. The attorneys prepared and submitted at least two Offers in Compromise to the IRS. Although the IRS contends that the first Offer was not made in "good faith" because it was submitted in the amount of $10.00, the record shows that an Attachment to the Offer consisted of a statement of facts and legal argument regarding the statute of limitations that explained the reason for the amount submitted. The Offer was also accompanied by a written Power of Attorney signed by both of the Debtor's attorneys. (Debtor's Exhibit 20). The IRS rejected the Offer. (Debtor's Exhibit 21).

After the rejection, the Debtor, through his attorneys, initiated a proceeding before an IRS Appeals Officer in Miami. The Debtor testified that the a hearing before the Officer lasted for one-half day, and resulted in the reduction of the amount of the IRS's claim by approximately $1,000,000.00. (Transcript, pp. 54–56).

Finally, in October or November of 1997, the Debtor submitted another Offer in Compromise in the amount of $113,500.00, which was accompanied by a check in the amount of the Offer. (Debtor's Exhibit 12). The Debtor testified that he borrowed the funds with which to make the Offer. The Debtor's attorney followed up on the Offer with three letters to the IRS dated January 27, 1998 (enclosing cer-

tain documentation requested by the IRS), March 24, 1998, and May 8, 1998. The Offer was ultimately rejected on September 24, 1998. (Debtor's Exhibit 14).

All of the evidence regarding the Debtor's contest of the IRS's claim is unrebutted. The point, of course, is that the Debtor did not "hide" from the IRS or ignore its system. Instead, the Debtor hired professionals and utilized the procedures established by the IRS itself to defend and challenge the tax claim.

Third, it appears that the Debtor paid income taxes due to the IRS other than the disputed taxes. The evidence shows, for example, that taxes were withheld and paid from the Debtor's salary while he was employed by Flair Communications in 1991, 1992, and 1993. (Debtor's Exhibit 11). The evidence also shows that the Debtor paid the IRS the sum of $113,776.69 in income taxes between July of 1994 and December of 1999. (Debtor's Exhibits 40, 42).

Finally, the uncontradicted testimony reveals that the Debtor never had the ability to pay the full amount of the tax liability for 1981, 1982, 1983, and 1984. (Transcript, p. 44). In fact, the evidence indicates that the Debtor's most valuable asset was his home, which was appraised at $200,000.00, or approximately one-tenth the amount of the claim, as of October 2, 1997. (Debtor's Exhibit 33). The home was encumbered by a mortgage held by HomeSide Lending, Inc. Further, an appraisal of the Debtor's personal property, including certain "sports memorabilia" located in the Debtor's home, was conducted in 1999 and resulted in a valuation of the personal property at $3,344.00. (Debtor's Exhibit 28). The IRS did not present any evidence to show that the Debtor had significant additional assets that were available to satisfy the tax claim.

Under all of the circumstances, therefore, the Court finds that the Debtor did not "willfully" evade the tax obligations at issue within the meaning of § 523(a)(1)(C) of the Bankruptcy Code. Clearly, the record reveals a protracted and convoluted dispute between the Debtor and the IRS concerning the tax obligation for the 1981, 1982, 1983, and 1984 tax years. The IRS, however, has not satisfied its burden of proving that the Debtor improperly shielded assets or thwarted the collection efforts of the IRS. See *In re Howard*, 167 B.R. 684, 689 (Bankr.M.D.Fla.1994). Although the effect of the Debtor's challenges is the nonpayment of the tax, the IRS has not proven that the nonpayment amounted to a "willful" evasion or defeat of the tax as contemplated by the statute.

## B. Conduct

As set forth above, for a tax obligation to be nondischargeable under the second prong of § 523(a)(1)(C), the debtor must have engaged in "affirmative acts" constituting a willful attempt to evade the tax. *In re Griffith*, 206 F.3d at 1395–96.

In this case, the Court finds that the IRS failed to satisfy its burden of proving any specific conduct that amounts to an evasion of the Debtor's tax liability within the meaning of the exception to discharge. The IRS did not offer any proof, for example, that the Debtor fraudulently transferred valuable assets to family members or third parties for the purpose of removing such assets from the reach of the IRS, or that the Debtor deliberately underreported his income to misrepresent his financial condition to the IRS. See *In re Burgess*, 199 B.R. 201, 207 (Bankr. N.D.Ala.1996).

Additionally, the IRS did not prove by a preponderance of the evidence that the Debtor made any specific false statements to the IRS regarding the extent or location

of his assets. The only assertion regarding the concealment of an asset relates to an account at Redstone Securities maintained by the Debtor in 1994. The Debtor listed the account on a July 1, 1994, Collection Information Statement submitted to the IRS, and represented that the account contained 1,300,000 shares of "F.L.C.T." stock at a value of $.0004 per share (or $520.00). The IRS contends that the representation is "inconsistent" with his disclosure on a Loan Application for a home mortgage that the account was worth approximately $300,000.00. (Transcript, pp. 163–64).

In response to the IRS's assertion, the Debtor testified that he initially completed the Loan Application in May of 1994, and that the stock in the account at that time consisted of his stock in Flair Communications. The Debtor further testified, however, that Flair Communications underwent a "reverse merger" after June 8, 1994, and that the stock became virtually worthless as a result of the transaction. (Transcript, pp. 139–40). Consequently, the Debtor claims that he accurately represented the value of the stock on the July 1, 1994, Collection Information Statement when he stated that the stock was worth only $520.00.

The IRS did not present any evidence to show that the stock in the Redstone Securities account was worth more than $520.00 on July 1, 1994. Consequently, the IRS did not establish that the Debtor falsely represented the value of a significant asset in his disclosures to the IRS.

Apart from the alleged misrepresentation regarding his Flair stock, the other conduct about which the IRS complains is the Debtor's use of cash, instead of checking accounts, to manage his financial affairs. Specifically, the IRS asserts that the Debtor "avoided using bank accounts to avoid the IRS collecting that money."

(Transcript, p. 165). According to the IRS, the Debtor arranged with his employer, H.B. London, for the employer to make his car payments, to pay his credit card bills, and to pay for various other personal expenses. See, for example, the IRS's Exhibits 12 through 16, consisting of checks written on H.B. London's bank account for expenses associated with the Debtor's sons, and Exhibits 22 through 32, consisting of checks written on H.B. London's bank account for the Debtor's credit card charges and attorney's fees. The IRS also asserts that H.B. London compensated the Debtor in cash, and that the Debtor thereafter paid his home mortgage and other home expenses by money order rather than check. (Debtor's Exhibit 36).

The Debtor acknowledges that he stopped using bank accounts at some point during his dispute with the IRS, because "every time I put money in, the IRS seized it out. So, you know, I still had to live and I still had to pay for, you know, my life." (Transcript, p. 59). It is clear, of course, that the IRS did levy on the Debtor's bank account as a means of collecting the tax. (See, for example, Debtor's Exhibit 23, consisting of a letter from AmSouth Bank informing the Debtor of the service of a tax levy against his account.).

The Court finds that the Debtor's decision to avoid bank accounts is not sufficient to establish an affirmative act of tax evasion. There is no indication in the record that the Debtor's acceptance of his salary in cash, or his use of company accounts and money orders, was illegal, prohibited or unauthorized in any way, and the Debtor used the cash for his ordinary living expenses.

Finally, the IRS contends that the Debtor repeatedly stalled the IRS's collection efforts, first by submitting at least two Offers in Compromise, and ultimately by

filing his chapter 7 bankruptcy petition. (Transcript, p. 169).

The Court has considered all of the evidence, and concludes that the IRS did not satisfy its burden of proving that the Debtor engaged in "affirmative acts" designed to evade the payment of the taxes at issue.

I also discount the government's complaint about the debtor's Tax Court litigation or the timing of his bankruptcy petition. There is a "venerable distinction between tax avoidance and tax evasion." *In re Kramer*, 215 B.R. 87, 89 (S.D.Fla.1997). *To the extent that a debtor employs legally permissible methods to avoid paying taxes, such conduct does not constitute improper tax evasion.*

*In re Schlesinger*, 290 B.R. 529, 539 (Bankr.E.D.Pa.2002)(Emphasis supplied). Although the Debtor has persistently avoided payment of the taxes at issue, the IRS did not establish that the Debtor made any false statements to the IRS regarding the location and value of his assets. Further, the IRS did not show that the Debtor's practice of paying his living expenses in cash, without more, constitutes an improper tax evasion.

## Conclusion

The IRS filed a Proof of Claim in the Debtor's chapter 7 case in the amount of $2,064,558.00 for income tax liabilities from the 1981, 1982, 1983, and 1984 tax years. The Debtor contends that the taxes are dischargeable in his chapter 7 case, because they do not fall within any exception to dischargeability under § 523(a) of the Bankruptcy Code.

In response, the IRS contends that the taxes are nondischargeable under § 523(a)(1)(C) of the Bankruptcy Code, because the Debtor "willfully attempted ... to evade or defeat such tax." The IRS bears the burden of proving the applicability of the exception by a preponderance of the evidence.

The IRS failed to satisfy its burden with respect to either of the two required elements under the second prong of § 523(a)(1)(C). First, the IRS did not show that the Debtor "willfully" violated his duty to pay the taxes. Second, the IRS did not show that the Debtor engaged in any "affirmative acts" designed to evade the collection of the taxes.

The Debtor's tax liabilities for the 1981, 1982, 1983, and 1984 Tax years are dischargeable in this chapter 7 case.

Accordingly:

**IT IS ORDERED** that:

1. The Debtor's income tax liabilities for the 1981, 1982, 1983, and 1984 tax years, as set forth in Proof of Claim No. 1 filed by the United States of America, Internal Revenue Service, are dischargeable in the chapter 7 case of the Debtor, William O'Callaghan.

2. A separate Final Judgment will be entered in this adversary proceeding in favor of the Debtor, William O'Callaghan, and against the Defendant, the United States of America, Internal Revenue Service.

## FINAL JUDGMENT

**THIS CASE** came before the Court to consider the entry of a Final Judgment in this adversary proceeding. The Court has entered its Findings of Fact, Conclusions of Law, and Memorandum Opinion, and it is appropriate to enter a Final Judgment.

Accordingly:

**IT IS ORDERED** that:

1. Final Judgment is entered in this proceeding in favor of the Debtor, William O'Callaghan, and against the Defendant,

the United States of America, Internal Revenue Service.

2. The Debtor's income tax liabilities for the 1981, 1982, 1983, and 1984 tax years, as set forth in Proof of Claim No. 1 filed by the United States of America, Internal Revenue Service, are dischargeable in the chapter 7 case of the Debtor, William O'Callaghan.